*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0380p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

RAYMOND PARKER MYERS,

        *Plaintiff-Appellant,*

    *v.*

No. 04-6022

CLEMENT D. POTTER, individually and in his official capacity as District Attorney General for the 31st Judicial District of Tennessee; et al.,

        *Defendants,*

NICHOLE HUTCHINS, individually; JOE MELTON, in his official capacity as Chief of Police of the City of McMinnville, Tennessee Police Department,

        *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Winchester.
No. 03-00087—James H. Jarvis, District Judge.

Argued: June 3, 2005

Decided and Filed: September 7, 2005

Before: RYAN, MOORE, and COOK, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Cynthia A. Wilson, Cookeville, Tennessee, for Appellant. Daniel H. Rader III, MOORE, RADER, CLIFT & FITZPATRICK, Cookeville, Tennessee, for Appellees. **ON BRIEF:** Cynthia A. Wilson, Cookeville, Tennessee, for Appellant. Daniel H. Rader III, MOORE, RADER, CLIFT & FITZPATRICK, Cookeville, Tennessee, for Appellees.

    RYAN, J., delivered the opinion of the court, in which COOK, J., joined. MOORE, J. (pp. 10-11), delivered a separate concurring opinion.

1

---

**OPINION**

---

RYAN, Circuit Judge.  The plaintiff, Raymond Parker Myers, brought a 42 U.S.C. § 1983 civil rights action against defendant Police Officer Nichole Hutchins, in her individual capacity, and defendant Police Chief Joe Melton, in his official capacity, for violations of Myers's rights under the Fourth and Fourteenth Amendments.  The district court entered summary judgment for Hutchins on the grounds of qualified immunity, and for Melton because Myers failed to make out an actionable failure-to-train claim.  Myers has appealed and we now reverse.

**I.**

On July 30, 1999, the McMinnville, Tennessee, Fire Department responded to a house fire in Warren County, Tennessee.  Inside the house, firefighters discovered the bodies of Dianne Watts, her daughter Jessica Watts, and Jessica's friend, Chelsea Smith.  Fire department investigators determined that the fire had been deliberately set, and autopsies revealed that each of the deceased had suffered blunt-force trauma to the head.

Prior to April 1999, Raymond Parker Myers, whom we will refer to as Raymond or Myers, and his father, Raymond Douglas Myers, Sr., lived in the house with Watts and her daughter Jessica.  Watts was Raymond Douglas Myers's girlfriend.  Raymond, who was 14 years old at the time of the fire, had lived in Watts's house for approximately five years.  In 1998, Watts had been granted temporary legal custody of Raymond primarily to provide him with medical insurance coverage.  A few months before the fire, Raymond moved out of Watts's residence and began residing with his mother, Teresa Myers, in Winchester, Tennessee.

While investigating the blaze and the three deaths, Tennessee law enforcement personnel suspected that Raymond Douglas Myers had committed the brutal crimes in Watts's household.  From July 30, 1999, through August 4, 1999, law enforcement officials interviewed Raymond, his father, and his mother on several occasions at the mother's house in Winchester.  On August 4, 1999, officials returned to the house and took Raymond Douglas Myers into custody.  Later that afternoon, Investigator Jason Rowland of the District Attorney's Office, Special Agent Phillip Gentry of the Tennessee Arson and Bomb Squad, and Officer Nichole Hutchins of the McMinnville Police Department arrived at Ms. Myers's house and began to interrogate Raymond.  The record reveals that Raymond signed a *Miranda* waiver at 1:05 p.m.  After questioning Raymond for a while, Hutchins and Gentry, apparently dissatisfied with the results of the interrogation, asked Ms. Myers for permission to take her son to the local Franklin County District Attorney's Office for additional questioning.  Initially, Ms. Myers refused, telling the officers they could continue to interview her son in her home.  When she asked the officers why they needed to take her son away for questioning, Hutchins responded that "[they] just needed to question him more on the case." According to Ms. Myers, Hutchins said:  "He will be in real good hands, we will have him back in an hour."  Ms. Myers asked if she could go with her son, to which Gentry responded:  "[T]hat won't be necessary, we will have him right back."  The other officers nodded in agreement.  Gentry then said:  "[W]e will have him back in an hour, I promise."  Ms. Myers eventually relented, saying:  "Ya'll [sic] have him right back in an hour."  Hutchins states in her affidavit that she did not participate in any discussion to obtain Ms. Myers's consent, nor did she misrepresent any fact to Ms. Myers.

Raymond was placed in the rear of an unmarked vehicle driven by Hutchins.  According to Raymond's affidavit, one of the officers immediately called someone on a cell phone and said:  "We've got Raymond.  We are on our way."  Contrary to the representations made to Raymond's mother, the officers did not take Raymond to the District Attorney's Office in Franklin County, but

to the District Attorney's Office in Warren County, which is approximately a one hour drive from Raymond's house. When they arrived at the District Attorney's Office in Warren County, Raymond was escorted into a room occupied by Tennessee Bureau of Investigation Agent Malcolm Elrod, who interrogated Raymond for approximately four hours, during which time Raymond signed a second *Miranda* waiver and a consent form for a polygraph examination. According to Raymond's affidavit, Elrod conducted a polygraph examination, threatened Raymond with life imprisonment, repeatedly called him profane names, and showed him photographs of the charred bodies discovered during the fire. Raymond made repeated requests to go home, to be with his mother, and to speak with an attorney, all of which were denied. Hutchins was not present during the interrogation by Elrod.

Raymond claims that, after being questioned by Elrod, he was interrogated further by Hutchins. Raymond claims that during this interrogation he was crying and told Hutchins he wanted to go home. His request was again denied. Hutchins disputes these allegations, claiming that she did not participate in any questioning of Raymond at the District Attorney's Office.

Ms. Myers eventually became frantic when her son was not returned to her home as promised. At approximately 10:30 p.m., almost six hours after Raymond was taken into custody, Clement Dale Potter, the District Attorney General for the 31st Judicial District of Tennessee, called Ms. Myers and informed her that her son would not be returning home and that to obtain his release she would have to obtain a court order. Ms. Myers claims that Potter refused to tell her where her son was being held or the reasons for his detainment.

That evening, Potter, or someone at his direction, contacted the Tennessee Department of Children's Services (TDCS) requesting assistance in placing Raymond in foster care. Raymond was detained at the District Attorney's Office in Warren County until approximately 2:30 a.m. the following morning, when he was transported to a foster home in Grundy County, Tennessee. Later that day, someone informed the Juvenile Court of Warren County that Raymond's legal guardian, Dianne Watts, had been killed and that if the boy were not taken into custody, he would be removed from the jurisdiction of the court. The Juvenile Court entered a Protective Custody Order the same day, placing Raymond in the custody of TDCS. Raymond was held in TDCS custody for more than three weeks, during which time he was interviewed several more times by Hutchins and other law enforcement officials. On August 31, 1999, through a court order, Ms. Myers secured Raymond's release and brought him home.

Raymond Douglas Myers was eventually indicted for the triple murder of Dianne Watts, Jessica Watts, and Chelsea Smith. Raymond testified at his father's criminal proceedings concerning the details of his detention and interrogation by Hutchins and other law enforcement officials. The trial court granted Raymond Douglas Myers's motion to suppress his son's statements to Agent Elrod because the court determined that those statements had been coerced. The trial court did not suppress the statements Raymond had given to Hutchins. After a jury trial, Raymond Douglas Myers was convicted of three counts of first-degree murder and one count of aggravated arson, and was sentenced to life in prison without the possibility of parole.

On October 10, 2003, Raymond Myers filed a § 1983 civil rights complaint against Officer Hutchins, Investigator Rowland, Agent Gentry, and Agent Elrod in their individual capacities, Attorney General Potter in his individual and official capacities, and McMinnville Police Chief Joe Melton in his official capacity, for violations of Raymond's constitutional rights under the Fourth and Fourteenth Amendments. Myers alleged that the defendants had conspired to deprive him of his constitutional rights, and that Chief Melton "failed to properly train Defendant Hutchins in the proper method to reasonably seize and/or obtain custody of a minor for interrogation or other purposes." The complaint also alleged several state law claims. Three days later, on October 13, 2003, Myers filed a Claim for Damages with the State of Tennessee Division of Claims

Administration.  All of the defendants originally named in Raymond's civil suit were also named in the claim, with the exception of Hutchins and Melton, the defendants in the present appeal.  On December 16, 2003, Potter, Rowland, Elrod, and Gentry filed a motion to dismiss this case, arguing that the filing of the Claim for Damages operated as a waiver of Myers's federal causes of action against such defendants.  On February 6, 2004, the district court entered a stipulated order dismissing the claims against those defendants without prejudice.

The remaining defendants, Hutchins and Melton, then filed a motion for summary judgment.  Myers filed a response in opposition to the motion, while simultaneously submitting an affidavit pursuant to Federal Rule of Civil Procedure 56(f) declaring that he needed additional discovery to respond to the motion.  Thereafter, Hutchins and Melton filed a motion to stay discovery pending the district court's ruling on their motion for summary judgment.  The district court did not respond to either party's request regarding discovery.  Instead, on July 19, 2004, the court granted both defendants summary judgment.

## II.

We review *de novo* a district court's order granting a motion for summary judgment.  *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003).  In conducting such a review, we must assume the truth of the non-moving party's evidence and must construe all inferences from that evidence in the light most favorable to the non-moving party.  *Id.*

Section 1983 imposes civil liability on any person who, acting under color of state law, deprives another person of the "rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  Qualified immunity is an affirmative defense whereby state officials performing discretionary functions are "shield[ed] . . . from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  When this defense is interposed, it becomes the plaintiff's burden to prove that the state officials are not entitled to qualified immunity.  *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).

In evaluating the merits of a qualified immunity defense, a court must engage in a two-step analysis:  "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established."  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005).  Although some courts occasionally employ a third step to determine whether the state official's actions are objectively unreasonable in light of the clearly established constitutional rights, "[i]n many factual contexts, . . . the fact that a right is 'clearly established' sufficiently implies that its violation is objectively unreasonable."  *Id.* at 311 n.2.

The qualified immunity defense is not available to municipalities or to persons acting on behalf of municipalities, such as Police Chief Joe Melton, when sued in their official capacity only.  *Owen v. City of Independence*, 445 U.S. 622, 657 (1980).  Therefore, the qualified immunity discussion that follows applies only to defendant Hutchins.

### A.  Constitutional Violation

We first consider whether the evidence, taken in the light most favorable to Myers, demonstrates the occurrence of a constitutional violation. Myers argues that his Fourth Amendment right to be free from an unreasonable seizure was violated when Officer Hutchins and other Tennessee law enforcement personnel removed him from his home and transported him to the District Attorney's Office in Warren County for questioning.

The Fourth Amendment, made applicable to the states through the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643 (1961), grants citizens the right to be free from unreasonable searches and seizures. U.S. CONST. amend. IV. Although certain seizures are reasonable even if based on something less than probable cause, *see, e.g.*, *Terry v. Ohio*, 392 U.S. 1, 20 (1968), the Supreme Court has never "sustained against Fourth Amendment challenge the involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes, whether for interrogation or fingerprinting, absent probable cause or judicial authorization." *Hayes v. Florida*, 470 U.S. 811, 815 (1985). For example, in *Davis v. Mississippi*, 394 U.S. 721, 726-27 (1969), the Supreme Court rejected the argument that detaining an individual at a police station for the purpose of obtaining his fingerprints was not a seizure requiring probable cause simply because the detention occurred during an investigative rather than an accusatory stage. The Court acknowledged that the police had no intention of charging the petitioner with a crime when he was detained, but was concerned that "[i]nvestigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention." *Id.* at 726. The Court went on to observe "that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" *Id.* at 726-27.

Similarly, in *Dunaway v. New York*, 442 U.S. 200, 212 (1979), the Court refused to authorize an investigative detention at a police station based on something less than probable cause, irrespective of whether the detention amounted to an "arrest" under state law. The Court explained "that detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Id.* at 216. The Court thus concluded that the police violated the petitioner's Fourth and Fourteenth Amendment rights "when, without probable cause, they seized petitioner and transported him to the police station for interrogation." *Id.*

In this case, Raymond Myers, then a 14-year-old boy, was removed from his mother's house and taken to the District Attorney's Office in Warren County for an investigative interrogation. Neither defendant Hutchins, nor any other law enforcement official, had any judicial authorization to take Myers into custody when he was initially seized. Hutchins does not claim she had probable cause to arrest Myers as a suspect in the crime committed at Watts's household, though she does argue that she had probable cause to arrest Myers as a material witness. Hutchins's brief, for example, asserts that "[l]aw enforcement authorities had information from an informant that . . . ***the plaintiff***[] was at the murder scene or with his father shortly after the murders had been committed," but there is nothing in the record to support such a claim. Hutchins also claims "[i]t was learned" that Raymond Myers was attempting to create an alibi defense for his father, but again Hutchins does not substantiate her assertion with references to the record demonstrating how and when she learned of this information. Myers's statements to the police, obtained days after he was initially taken into custody, cannot provide a *post hoc* justification for the seizure that took place days before. Moreover, those statements reveal that Myers "never saw [his] dad from 1:00 am until around 7:00 am" on the morning of the fire. In any event, the evidence in the record belies the contention that Hutchins and the other officers "arrested" Myers as a material witness. The officers did not place Myers in handcuffs, nor did they inform him that he was under arrest as a material witness or on any other grounds. Myers was taken into police custody only after the officers pleaded for and obtained his mother's permission to take him to the Franklin County District Attorney's Office for additional questioning.

The Supreme Court has indicated that, even though state officials do not have probable cause or judicial authorization to detain an individual for investigative purposes, such detentions are reasonable if the individual "voluntarily accompanie[s] the police officers to headquarters," *Davis*, 394 U.S. at 726, or otherwise "consent[s] to the journey to the police station," *Hayes*, 470 U.S. at 814. The district court apparently justified Myers's removal to the District Attorney's Office in part

under this rationale, noting that Myers "gave the officers permission to interview him" and that he "voluntarily agreed to be interviewed by Officer Hutchins by signing a consent form, which contains a *Miranda* warning."

The record indicates that at about 1:05 p.m., on August 4, 1999, Myers signed a *Miranda* waiver before being questioned by police at his mother's house, or approximately four hours before he was taken to the District Attorney's Office in Warren County. Myers also signed another *Miranda* waiver prior to his interrogation by Agent Elrod. By signing the *Miranda* waivers, Myers acknowledged and waived his right to remain silent and to have an attorney present during police questioning; the waivers say nothing about Myers's Fourth Amendment right to be free from an unreasonable seizure, nor do they indicate that Myers consented to being transported to the Warren County District Attorney's Office for such questioning. Notably, the Tenth Circuit has rejected the argument that an individual who signs a *Miranda* waiver consents to being transported to and questioned at a police station:

> Although the waiver form recites [the plaintiff's] *Miranda* rights, it does not mention the right to be free from an arrest without probable cause or the right to terminate a consensual encounter. There is no statement in the waiver form informing [the plaintiff] that he had the right that he would have had if the encounter was truly consensual: the right to terminate the interrogation and walk out of the police station at anytime.

*Hatheway v. Thies*, 335 F.3d 1199, 1206-07 (10th Cir. 2003). In our view, the mere fact that Myers waived his *Miranda* rights does not conclusively determine whether he consented to his removal and detention at the District Attorney's Office in Warren County.

The district court also concluded that the officers did not violate Myers's rights by transporting him to Warren County for questioning because Teresa Myers "gave permission to the officers to interview her son." The record evidence, however, indicates that Teresa Myers's consent was obtained only after Hutchins falsely represented that Myers would be questioned only a few miles away at the District Attorney's Office in Franklin County, and that the boy would be returned to his house within an hour. Despite these representations, Hutchins and the other officers immediately took Myers for a one hour drive to the District Attorney's Office in Warren County, not Franklin County, interrogated him for approximately four hours, and Myers did not return to his mother's house until over three weeks later. During Raymond Douglas Myers's criminal proceedings, the state trial court found that Raymond and his mother had been misled by the police and that Myers's detention exceeded the scope of consent given by his mother:

> In this case, we have a minor child who was taken from his parents['] custody by what appears to have been a clear misrepresentation. [Myers's] mother only agreed for her son to be questioned for one additional hour. It is therefore[] this court's opinion that the interview with agent Elrod exceeded the scope of consent by [Myers's] mother[.]"

We have noted in the criminal context that, "[b]ecause the government often asserts that a defendant consented in cases 'where the police have some evidence of illicit activity, but lack probable cause to arrest or search,' . . . we carefully examine the government's claim that a defendant consented." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). Valid consent exists only when it is "'unequivocally, specifically, and intelligently given,'" *Worley*, 193 F.3d at 386 (citation omitted), and it must be "uncontaminated by duress, coercion, or trickery," *United States v. Jones*, 641 F.2d 425, 429 (6th Cir. 1981). Teresa Myers declared in her affidavit that she would not have consented to Myers's removal from her house had she known that the officers were going to take him to

Warren County and keep him in custody for weeks, contrary to the officers' representations. Similarly, Raymond declared in his affidavit that he would have refused to accompany the officers had he known that he was going to be taken to Warren County for questioning. In view of the officers' false and deceptive representations, there is at least a genuine issue as to whether Myers and his mother gave valid consent to the investigative detention.

But even if Myers and his mother consented to Myers being transported to Warren County for questioning, subsequent events clearly demonstrate that his detention ceased to be consensual. According to Myers, he wanted to leave the District Attorney's Office, but the doors were locked behind him and he "could [not] leave without them letting me." He alleges that he repeatedly asked to be taken back to his mother's house and specifically told Hutchins that he "want[ed] to go home," but was denied that request. We note, as did the state court during Raymond Douglas Myers's criminal proceedings, that the length of the detention and interrogation far exceeded the one hour of questioning to which Ms. Myers had consented. Even "an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *INS v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Myers "repeatedly asked to go home and [Officer Hutchins] expressly declined to honor that request. In light of [Myers's] requests, no reasonable officer would have concluded that [Myers] consented to remaining at the [District Attorney's Office]." *Hatheway*, 335 F.3d at 1207.

Because Myers was detained in police custody without probable cause, judicial authorization, or valid consent, his Fourth Amendment right to be free from an unreasonable seizure was violated. We find it unnecessary to decide whether there was sufficient evidence of a conspiracy among the officers to deprive him of such a right. Myers has presented evidence that Hutchins personally participated in his removal to and detention at the District Attorney's Office. If Myers is able to prove his allegations at trial, there will be sufficient evidence to impose liability on Hutchins for a Fourth Amendment violation, regardless of whether the other officers, who are no longer parties to this case, conspired to deprive Myers of his constitutional rights.

## B. Clearly Established Law

Having determined that there was a constitutional violation when construing the evidence in the light most favorable to Myers, we now turn to the question whether the Fourth Amendment right violated by Officer Hutchins was clearly established at the time Myers was taken into police custody. In undertaking this inquiry, we do not assess the right violated at a high level of generality, but, instead, we must determine whether the right was "'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 639-40. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 640 (internal citation omitted). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "When determining whether a right is 'clearly established,' we 'look first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits.'" *McBride v. Village of Michiana*, 100 F.3d 457, 460 (6th Cir. 1996) (citation omitted).

Ever since the Supreme Court's *Dunaway* decision in 1979, it has been well-established that an investigative interrogation, such as the one endured by Myers, must be supported by probable cause to avoid infringing upon an individual's Fourth Amendment right to be free from an unreasonable seizure. *Dunaway*, 442 U.S. at 216. We have discovered no evidence in the record

from which a reasonable officer could conclude that, at the time Raymond was removed from his mother's house, there was probable cause to arrest him, either as a suspect in the crime for which his father was convicted, or as a material witness. Hutchins apparently was aware of this lack of evidence as well, since she and the other officers felt compelled to resort to false representations to obtain Raymond's "consent" and his mother's permission before taking Raymond into police custody.

The particularized inquiry we employ to determine whether Hutchins should be entitled to qualified immunity is whether it would have been clear to a reasonable officer in Hutchins's position that the "consent" obtained from Myers and his mother was legally insufficient to justify Raymond's seizure and detention. It is, we think, indisputable that a reasonable officer would have known that it was unlawful to take Myers into custody by using false representations as to the location and expected duration of the interrogation in order to obtain his consent and that of his mother. And no reasonable officer would have believed that Myers's detention was consensual after he made repeated requests to go home within hours of his detainment.

It is not a novel proposition in the law that even an initially consensual encounter between police officers and an individual can ripen into a seizure for which probable cause must be shown. *Delgado*, 466 U.S. at 215. To determine whether a person has been seized within the meaning of the Fourth Amendment, the inquiry is whether, "'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id.* (citation omitted). In this case, after Myers was transported to the District Attorney's Office, the doors were locked behind him. Myers alleges that, shortly after his arrival, he began asking for his mother and his request was denied. He claims that he knew he could not leave without the officers' permission and repeatedly asked to go home. He was interrogated for approximately four hours—far surpassing the one hour of interrogation authorized by his mother—at a location many miles from his house. Under these circumstances, "[i]t cannot seriously be suggested that . . . a reasonable person in [Myers's] situation would have thought he was sitting in the interview room as a matter of choice, free to change his mind and go home to bed." *Kaupp v. Texas*, 538 U.S. 626, 632 (2003). Nor can it seriously be contended that a reasonable officer would have believed that Myers's detention and interrogation were consensual under these circumstances.

We hold that a reasonable officer in Hutchins's position would have known that, in light of Myers's detainment without probable cause or judicial authorization, the false representations made to him and to his mother to obtain their "consent" to his detainment, and his repeated requests to be released, Raymond's clearly established constitutional rights were being violated. Accordingly, the district court erred in concluding that Officer Hutchins is entitled to qualified immunity.

## III.

Although Myers also appeals the district court's grant of summary judgment for Police Chief Joe Melton with respect to his failure-to-train claim, Myers does not discuss this claim in his brief, nor did he discuss it in the district court. Myers apparently concedes that he has no evidence to support such a claim, arguing instead that he needs "discovery to prove his failure to train claim." In this connection, Myers argues that the district court abused its discretion in granting summary judgment to the defendants despite Myers's request for permission to conduct further discovery pursuant to Federal Rule of Civil Procedure 56(f).

In its scheduling order, the district court set a trial date of October 19, 2004, and ordered all written discovery to be served 120 days before trial, all depositions of fact witnesses to be taken 60 days before trial, and all depositions of expert witnesses to be taken 30 days before trial. The defendants filed their motion for summary judgment on February 18, 2004, well before the close of discovery. The motion was granted on July 19, 2004.

This court has declared that "in litigation against government officials [discovery] should be halted until the threshold question of immunity is resolved." *Criss v. City of Kent*, 867 F.2d 259, 261 (6th Cir. 1988). The rationale underpinning this policy is the notion that qualified immunity "is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Myers, however, brought suit against Chief Melton only in his official capacity as Chief of Police of the City of McMinnville. "A suit against an individual in his official capacity is the equivalent of a suit against the government entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). Thus, Myers's claim against Chief Melton is, in effect, a claim against the municipality that Chief Melton serves, namely, the City of McMinnville, for which the defense of qualified immunity is not available. "[U]nlike the qualified immunity entitlement, municipal defenses under § 1983 are not a right to immunity from trial but a 'mere defense to liability.'" *Summers v. Leis*, 368 F.3d 881, 889 (6th Cir. 2004) (quoting *Swint v. Chambers County Comm'n*, 514 U.S. 35, 43 (1995)). Therefore, unlike the situation in which the defense of qualified immunity is asserted, there is no analogous necessity for a district court to render an early decision, prior to a reasonable period for discovery, regarding a municipality's defenses to liability under § 1983. Accordingly, we think the district court's summary judgment for Chief Melton on Myers's failure-to-train claim was premature and that Myers should have been granted more time to conduct discovery with respect to that claim. On remand, the district court should fix new discovery deadlines.

## IV.

For the foregoing reasons, the district court's summary judgment for the defendants is **REVERSED**.

———————————————

## CONCURRENCE

———————————————

KAREN NELSON MOORE, Circuit Judge, concurring. I concur in Judge Ryan's opinion, except I adhere to the three-step test that we have established for evaluating qualified immunity defenses. In our opinion in *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003), we stated the three-part test as follows:

> Qualified immunity involves a three-step inquiry. First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996)); *see also Saucier v. Katz*, 533 U.S. 194 (2001).

If the plaintiff fails to establish any one of these elements, qualified immunity must be granted. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005).

In *Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005), we explained how the three-part test implements the governing standards from the Supreme Court, as expressed in *Saucier v. Katz*, 533 U.S. 194 (2001). As we stated in *Sample*,

> The Supreme Court in *Saucier* stated that when reviewing claims of qualified immunity, the initial inquiry must be "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201. If a constitutional violation has been established, the Court stated that "the next, sequential step is to ask whether the right was clearly established." *Id.* These two inquiries form the preliminary two steps in the *Feathers* approach.

> If we find the first two requirements have been met, the final inquiry is "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Feathers*, 319 F.3d at 848. This final requirement directly flows from the Court's recognition that "[t]he qualified immunity inquiry . . . has a further dimension." *Saucier*, 533 U.S. at 205. Specifically, the Court noted that "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id.* "Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the 'objective legal reasonableness' of the action, assessed in light of legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal citation omitted). Thus, the Court explained that "even if a court were to hold that [an] officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, *Anderson* still operates to grant officers immunity for reasonable mistakes as to the legality of their actions." *Saucier*, 533 U.S. at 206. In *Saucier*, the Court reaffirmed the principle laid out in *Anderson*, and stated that

> "[i]f the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense." *Id.* at 205; *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (noting that qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law").

*Sample*, 409 F.3d at 696 n.3.

Judge Ryan's opinion combines the second and third steps in concluding that "a reasonable officer in Hutchins's position would have known that . . . Raymond's clearly established constitutional rights were being violated." Although I would have analyzed each step separately, I am in complete agreement with Judge Ryan both that the Fourth Amendment right was clearly established at the time Myers was taken into custody and that Myers "has offered sufficient evidence to indicate that what [Hutchins] allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Feathers*, 319 F.3d at 848. Therefore, applying the three-part test, I concur in Judge Ryan's opinion.