*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0377p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ALAN TAYLOR,

　　　　　*Plaintiff-Appellant,*

　　*v.*

MICHIGAN DEPARTMENT OF NATURAL RESOURCES,
　　　　　*Defendant,*

PAUL ROSE, Conservation Officer, in both his
Official Capacity and Individual Capacities;
REBECCA A. HUMPHRIES, Director of the
Department of Natural Resources, in her Official
Capacity,

　　　　　*Defendants-Appellees.*

No. 05-2732

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 03-00225—Robert Holmes Bell, Chief District Judge.

Argued: October 27, 2006

Decided and Filed: September 14, 2007

Before: KENNEDY and GIBBONS, Circuit Judges; ALDRICH, District Judge.[*]

---

### COUNSEL

**ARGUED:** Steven J. Vander Ark, Grand Rapids, Michigan, for Appellant. Mark E. Donnelly, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:** Steven J. Vander Ark, Grand Rapids, Michigan, for Appellant. Mark E. Donnelly, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

　　KENNEDY, J., delivered the opinion of the court, in which GIBBONS, J., joined. ALDRICH, D. J. (pp. 7-12), delivered a separate dissenting opinion.

---

[*]The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

———————————

## OPINION

———————————

KENNEDY, Circuit Judge.   Alan Taylor seeks review of the district court's grant of summary judgment for the defendants, asserting that the trial court erred (1) in concluding that the conservation officer's conduct did not constitute a search or an invasion of privacy, (2) in finding that the conservation officer was entitled to qualified immunity, and (3) in determining that plaintiff lacked standing to seek prospective injunctive relief against the director of the Department of Natural Resources in her official capacity.   We find that the property check at issue was not a warrantless search in violation of the Fourth Amendment and, for the reasons that follow, affirm the district court.

## BACKGROUND

On February 20, 2003, longtime conservation officer Paul Rose approached plaintiff's 240-acre fenced property, located in a rural area, Newaygo County, Michigan, to investigate a complaint regarding fencing.  Under state law, it is a misdemeanor to unlawfully erect a barrier denying ingress or egress to an area where the lawful taking of animals may occur.  Officer Rose found no violation but, after seeing tire tracks up to the open driveway and footprints continuing, proceeded onto the property, passing two "No Trespassing" signs, toward the log and stone house.  His affidavit states that he called out to determine if anyone was home.  Officer Rose peered into the windows of the home and garage, shielding his eyes from the daytime sun with cupped hands, and he rattled the doorknobs of the home and garage.  At the end of his "rounds," Officer Rose came to the front door and left his business card in the door.  The "property check" lasted approximately five minutes.

Officer Rose claims that he conducted the check because he thought a trespasser or intruder might be on the property, a concern he asserts was prompted by his observation of the footprints and tire tracks in the snow.[1]   The tire tracks stopped at the entrance to the property, but the footprints appeared to lead in the direction of the residence, gradually dissipating due to limited snow cover. Plaintiff claims that the gate and the location from which the observation was made are approximately a quarter mile from the home.  Officer Rose recounts that he interpreted the house's open curtains to be suspicious because, based on over twenty years of experience as a conservation officer, most absentee owners of rural homes close their curtains when not present, and intruders open them in order to observe approaching vehicles.[2]   Upon returning home, plaintiff found the business card the officer had left behind and, per the request noted on the card, called the officer. Officer Rose explained the fence complaint and offered assistance in the event of future trespassing problems but did not discuss the property check he had conducted.

After reviewing his home security tape, plaintiff contacted the director of the Michigan Department of Natural Resources ("DNR") to report the allegedly illegal conduct of Officer Rose. The director replied by stating that the officer's conduct was proper and that law enforcement officers customarily conduct property checks. Unsatisfied with the department's response, plaintiff filed a complaint in federal court, ultimately seeking nominal damages against the conservation officer and injunctive relief against the director of the DNR, bringing a 42 U.S.C. § 1983 claim

———————————

[1] While it appears that plaintiff resided in this home for approximately half of each year, based on the area and time of year, the officer assumed that the home was temporarily unoccupied by its owners and thus more susceptible to robbery.

[2] This reason for entering the property was supplied by affidavit in response to the property owner's motion for summary judgment.  Plaintiff does not suggest an alternative explanation for the officer's conduct.

alleging violation of his Fourth Amendment right to be free from unreasonable searches and invasion of privacy, similar claims of violation of the Michigan Constitution, a negligence claim for failure to train conservation officers, and state law claims of trespass. The trial court granted defendants' cross-motion for summary judgment on the federal claims, concluding that the officer's conduct was not a search and, even assuming a constitutional violation, that the officer was entitled to qualified immunity. The court declined to exercise supplemental jurisdiction over the state claims. Plaintiff appeals the district court's grant of summary judgment for the defendants.

## ANALYSIS

Plaintiff asserts three issues on appeal, arguing that Officer Rose's conduct did constitute a search, that his conduct was not protected by qualified immunity, and that plaintiff has standing to seek injunctive relief. This court's review of a grant of summary judgment is de novo. *Summar v. Bennett*, 157 F.3d 1054, 1057 (6th Cir. 1998). We find that Officer Rose's conduct does not rise to the level of a search within the meaning of the Fourth Amendment and thus no constitutional violation occurred, and therefore affirm the district court's denial of plaintiff's claim under 42 U.S.C. § 1983.

I.

Plaintiff argues that the trial court erred in concluding that Officer Rose's conduct did not constitute a search. The occurrence of a "search" is defined in terms of whether a person had a "constitutionally protected reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). When interpreting the *Katz* definition, a "reasonable expectation of privacy" exists when (1) "the individual [has] manifested a subjective expectation of privacy in the object of the challenged search" and (2) "society [is] willing to recognize that expectation as reasonable." *California v. Ciraolo*, 476 U.S. 207, 211 (1986).

Applying *Katz*, the district court found, and defendants concede on appeal, that plaintiff had manifested a subjective expectation of privacy. Nevertheless, the district court concluded that Officer Rose's conduct did not satisfy the second prong of *Katz* because the methods used and the purpose for the observations indicate a low level of intrusion. The court noted that Officer Rose merely conducted naked-eye observations sans technological enhancements, and he did so under the auspices of performing a "property check." The court also found persuasive that Officer Rose was present on the property during the daytime, his check lasted only about five minutes, and he left a business card behind to notify the owner of his presence.

We agree with the district court's determination that Officer Rose's conduct does not constitute a search within the meaning of the Fourth Amendment based on its failure to satisfy the second element of the *Katz* analysis. Less than one year before we heard argument on this appeal, another panel of this court clarified the elements we are to consider when determining whether society is willing to recognize an expectation of privacy as reasonable in a case pertaining to officials' conduct on another piece of rural Michigan property. The panel's unanimous opinion in *Widgren v. Maple Grove Township* explains:

> The second prong of the *Katz* test generally addresses two considerations. The first focuses on "what a person had an expectation of privacy *in*, for example, a home, office, phone booth or airplane." . . . The second consideration examines "what the person wanted to protect his privacy *from*, for example, non-family members, non-employees of a firm, strangers passing by on the street or flying overhead in airplanes. . . . Other relevant factors in applying *Katz*'s second prong include "the intention of the Framers of the Fourth Amendment" . . . .

429 F.3d 575, 578-579 (6th Cir. 2005) (emphases in original) (internal citations omitted).  Our *Katz* prong two inquiry follows this framework, beginning with consideration of the "individual's sense of security" and then moving to the "government intrusion at issue."  *Id.* at 582 (internal citation omitted).

The nature of the property in which plaintiff claims an expectation of privacy weighs in favor of finding that society is willing to recognize that expectation as reasonable.  After all, Officer Rose's "property check" entailed observation of the interior of the home, "the prototypical and hence most commonly litigated area of protected privacy."  *Kyllo v. United States*, 533 U.S. 27, 34 (2001).  However, it is important to note that Officer Rose did not enter the plaintiff's home.  Rather, he checked the doors and windows to assure that they were secure, and he engaged in a relatively unintrusive view into the building's interior, per departmental custom.  His survey of the premises lasted only around five minutes.   "[T]he Fourth Amendment has drawn a firm line at the *entrance* to the house," requiring exigent circumstances to justify a warrantless search.  *Payton v. New York*, 445 U.S. 573, 590 (1980) (emphasis added).

There is even an exception to this rule based on suspicion of burglary.  Past cases reveal an "established precedent that the police may 'enter a residence . . . [if they] believe that there is a burglary in progress."  *United States v. McClain*, 430 F.3d 299, 304-305 (6th Cir. 2005), (citing *United States v. Reed*, 141 F.3d 644, 649 (6th Cir. 1998)).  While such cases have indicated that probable cause and exigency are both required to justify warrantless entry, it makes sense for the law to impose a greater burden on officers entering a home to ensure its safety than it demands to justify looking inside through open windows.  Officer Rose did not enter plaintiff's home.  He observed the interior of the house and its exterior from the outside only.  The Supreme Court has stated that even the fact "that [an] area is within the curtilage does not itself bar all police observation."  *Ciraolo*, 476 U.S. at 213.  Thus it becomes critical to examine the extent of the government intrusion, which *Widgren* has prescribed should include an inquiry into the methods used and purpose for the conduct at issue.  *Widgren*, 429 F.3d at 583.

Considering Officer Rose's limited methods of observation and the purpose of his conduct, we conclude that this "property check" is not a Fourth Amendment search.  In terms of methods, existing Fourth Amendment jurisprudence distinguishes between cases in which officers engaged in "ordinary visual surveillance" and those in which the officers employ "technological enhancement of ordinary perception."  *Kyllo*, 533 U.S. at 31, 33.  Like the officials in *Widgren*, Officer Rose "used naked-eye observations unaided by technological enhancements" to  survey the property.  *Widgren*, 429 F.3d at 585.  Admittedly, the present case differs from *Widgren* in that Officer Rose quickly surveyed the interior of the house, visible through open drapes, while the officers in *Widgren* only examined exterior features of the home.  Officer Rose, however, engaged in only a brief, minimally intrusive visual inspection.  Appellant accurately cites cases from other courts that interpret observation of the interior of a home through windows to constitute a search.  *See Brock v. United States*, 223 F.2d 681, 685 (5th Cir. 1955), *People v. Camacho*, 3 P.3d 878, 887 (Cal. 2000), *Lorenzana v. Superior Court of Los Angeles*, 511 P.2d 33, 35 (Cal. 1973), *People v. Haddad*, 332 N.W.2d 419, 420 (Mich. 1982) .  However, all of these cases are distinguishable from the matter at hand because they involve the conduct of law enforcement officers attempting to investigate suspected wrongdoing by the home owner/occupier without any professed protective element.  That is, the purpose of the officers' observations, a factor that we are to consider in such cases, differed from that of Officer Rose.

When considering whether the officials had conducted a search in *Widgren*, this court plainly stated that "[a] criminal investigation is generally more intrusive than an administrative or regulatory investigation."  *Widgren*, 429 F.3d at 583.  This analysis comports with our past interpretation that "[a] search implies an examination of one's premises or person with a view to the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action."  *United States v.*

*Blackburn*, 389 F.2d 93, 95 (6th Cir. 1968). Of course, not all non-criminal investigations are permissible. As the Supreme Court stated in *Camera v. Municipal Court*, "it is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." *Camera v. Municipal Court*, 387 U.S. 523, 530 (1967). Also, consideration of the purpose of the search should be distinguished from the law enforcement officer's subjective intent, the former being subject to deduction and of legal importance, the latter being difficult or impossible to discern and irrelevant. *See Bond v. United States*, 529 U.S. 334, 339 n.2 (2000). Here, no evidence indicates that Officer Rose would have any purpose for looking inside plaintiff's property other than the protective one that he supplies. The record does not indicate that Officer Rose had reports of criminal activity occurring within the house, nor does it suggest that the officer harbored any personal ill-will for the plaintiff. There is no evidence that Officer Rose was engaged in the "dirty business" that often accompanies an unjustifiable government intrusion. *Widgren*, 429 F.3d at 583 (citing *Olmstead v. United States*, 277 U.S. 438, 470 (1928) (Holmes, J., dissenting)).

We accept that, informed by his twenty-plus years of experience as a conservation officer and DNR custom, Officer Rose felt that conditions consistent with a wintertime break in of a potentially-seasonal home warranted a brief protective check. Upon arriving on the property, Officer Rose announced his presence. In broad daylight, he spent approximately five minutes looking in open windows and jiggling door knobs to ensure the safety of the home. After engaging in minimally intrusive observations to quell his suspicions, he left his card in the front door. In this context, we cannot find such an inspection constitutionally infirm.

Consideration of the underlying purposes of the Fourth Amendment solidifies our conclusion. The Supreme Court advised in *Kyllo* that we should construe the Fourth Amendment "in a manner which will conserve public interests as well as the interests and rights of individual citizens." *Kyllo*, 533 U.S. at 40 (citation omitted). Here, without physically intruding upon the home or employing any technology to substitute for a physical intrusion, Officer Rose observed the home in an effort to ensure the integrity of the property for the homeowner. "[T]his was a situation where a common sense assessment would be that a legitimate owner, could that person have been contacted, would want the officers to investigate the possible break in, [which] tips [us] in the direction of finding the [officer's] actions reasonable." *McClain*, 430 F.3d at 311 (Boggs, J., concurring).

II.

Plaintiff also argues that the trial court erred in finding that Officer Rose was entitled to qualified immunity. An officer is protected by qualified immunity provided his conduct did not run afoul of a right that is clearly established. To determine whether the officer's conduct violated a clearly established right, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). In this case, the district court ultimately determined that a reasonable conservation officer who had legally entered the premises and remained to conduct a brief, minimally invasive property check, like the one Officer Rose performed, for the purpose of ensuring the security of the home would not understand such conduct to violate the Constitution.

Because we determine that Officer Rose's conduct did not violate the Constitution, the officer need not rely on qualified immunity to avoid liability. By definition, if Officer Rose did not violate a constitutional right, he did not violate a constitutional right that is clearly established. This portion of the district court's opinion requires no further appellate attention to affirm.

III.

Plaintiff additionally argues that the trial court erred in finding he lacked standing to seek prospective injunctive relief against the director of the Department of Natural Resources in her official capacity. We need not address whether or not plaintiff would have had standing to request an injunction because, as determined above, there was no constitutional violation and therefore there is no ongoing unconstitutional conduct to enjoin.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.

---

**DISSENT**

---

ANN ALDRICH, District Judge, dissenting. I write separately to disagree with the panel's analysis of the Fourth Amendment issues. Therefore, I believe that the district court should be reversed in part and affirmed in part.

## I. Constitutionality Of Search

A. *Katz v. United States* Framework

The Fourth Amendment states in relevant part, "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue but upon probable cause." U.S. Const. amend. IV. *Katz v. United States*, 389 U.S. 347 (1967), provides the standard two-part test governing Fourth Amendment search violations. Specifically, (1) whether the individual has manifested a subjective expectation of privacy in the object of the challenged search; and (2) whether society is willing to recognize that expectation as reasonable. *Widgren v. Maple Grove Township*, 429 F.3d 575, 578 (6th Cir. 2005). The Sixth Circuit in *Widgren* further delineates the second prong of the *Katz* test. The second prong consists of two considerations. The first consideration is "what a person had an expectation of privacy *in*." *Id.* The second consideration examines "what the person wanted to protect his privacy *from*." *Id.* at 579. This requires an examination of the degree of government intrusion in (i) the methods used in the search, and (ii) the purpose for the search. *Id.* at 583. Based on the facts of this case, there was an unconstitutional search of Taylor's home.

Here, there is no disagreement as to whether Taylor manifested a subjective expectation of privacy. He most certainly did. It is with respect to the second prong of the *Katz* test, however, that I disagree with the panel.

First, Taylor's expectation of privacy in his home and the curtilage surrounding it satisfies the initial element of the second prong of the *Katz* test. Part one of the second prong of the *Katz* test looks at what Taylor had an expectation of privacy in. *Widgren*, 429 F.3d at 578. Principally, "[t]his inquiry centers on 'whether the human relationships that normally exist at the place inspected are based on intimacy, confidentiality, trust or solitude and hence give rise to a "reasonable" expectation of privacy.'" *Id.* at 578-579 (citations omitted).

Taylor's expectation of privacy in his home and the curtilage surrounding his home satisfies this standard. Taylor's home is a place where such intimate relationships exist and take place. Indeed, the Supreme Court accords special status to the sanctity of the home:

> The Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained. In *Silverman*, for example, we made clear that any physical invasion of the structure of the home, "by even a fraction of an inch," was too much, *365 U.S. at 512,* and there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the non-intimate rug on the vestibule floor. In the home, our cases show, *all* details are intimate details, because the entire area is held safe from prying government eyes.

*Kyllo v. United States*, 533 U.S. 27, 37 (2001) (emphasis in original). Therefore, Rose's peering into the home, garage, and bedroom window, was peering into a place that the Court recognizes intimate

relationships occur. Taylor's expectation of privacy was accordingly valid, thus satisfying the first element of the second prong of the *Katz* test.

Likewise, the second element of the second prong of the *Katz* test is also satisfied. In evaluating this element, our "inquiry focuses on the government intrusion at issue." *Widgren*, 429 F.3d at 579. This requires assessing the degree of the government intrusion by "addressing both the methods used and the purpose for the intrusion." *Id*. at 583.

The methods used in this case were sufficiently intrusive to categorize the search as unconstitutional. This was more than a mere naked-eye inspection of the exterior of the house, as was the case in *Widgren*. Here, Rose did in fact touch and look into the house. *See id*. at 585 (noting that the property assessor "did not touch enter or look into the house."). Furthermore, Rose obtained neither consent nor a warrant before breaching the curtilage of Taylor's property. *Id*. (stating that "tax appraisers would be well advised to obtain consent or a warrant as a matter of course before breaching the curtilage because, in many instances, such an intrusion may be a Fourth Amendment search"); *see also id*. at 583 (stating "breaching the curtilage and other trespass, though not necessarily determinative, are also relevant to the degree of government intrusion."). While it may be true that a passing policeman need not avert his eyes, here Rose walked up to various windows in Taylor's garage and home, pressed his face and hands against these windows and peered inward; what this method lacks in subterfuge and advanced technology it makes up for in sheer flagrancy.

"Like the methods used, the purpose for the interference bears upon the intrusiveness of government action." *Id*. Neither party disputes the fact that Rose's initial purpose was a lawful one. Rose was on the land investigating a complaint about the fencing on Taylor's property. And while one might applaud Rose for his concern about a potential intruder on Taylor's property, this purpose does not sanction Rose's search. Noting that the property check was brief, involved a low degree of intrusion, and was conducted in the middle of the afternoon, the district court opines that Rose was not carrying out a criminal investigation, which would carry with it the imprimatur of "suspicion of crime." *Taylor v. Humphries*, 402 F. Supp. 2d 840, 847 (W.D. Mich. 2005) (citations omitted). I disagree.

Rose states that his concern was that an intruder might be on the premises, a concern that was heightened when he saw the curtains drawn, which led him to believe that a burglar might be present. The purpose of this search then became a criminal investigation. Rose was searching for evidence of a burglar; to wit, he checked all the doors to see if they were open, and he checked all the windows to see if anyone had broken in. The fact that Rose was searching for someone other than Taylor does not make it any less a search of Taylor's home. Indeed, Rose might just as easily have come across a marijuana plant growing in Taylor's bedroom (notably, at oral argument, counsel for Defendant-Appellees was unable to offer an answer as to how such an encounter and subsequent arrest would not be an unconstitutional search).[1] Given that, Rose's argument amounts to "no harm done." While the harm in terms of damages may in fact be small, it is no less an unconstitutional search. *See, e.g., People v. Haddad*, 122 Mich.App. 229, 230 (Mich. Ct. App. 1982) (affirming the trial court's determination that an "officer had no right to peer through the [defendant's ]bedroom window when [the officer ]only had a suspicion of an assault and battery and a mere suspicion as to the safety of a person who might have been present.").

---

[1] The exchange went as follows: I asked, "You agree, I think, that if the officer had happened to see, say, a marijuana plant growing inside the house when he looked in the window, that that evidence couldn't be used to convict the homeowner of growing plants. So, if that's the case, then why isn't this a Fourth Amendment violations?" Counsel for Defendants-Appellees first noted the complexity of Fourth Amendment jurisprudence, and then answered, "I thought I might get asked a question like that from you, and I thought about it, and I thought about it, and I'm not sure what the answer is."

B. Curtilage

In addition to protecting Taylor's home, the Fourth Amendment also extends its scope of protection to the immediately surrounding property, or curtilage. Specifically, "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *California v. Ciraolo*, 476 U.S. 207, 213 (1986). This protection, however, is not limitless. *Id.* (noting that police need not cover their eyes on public thoroughfares, nor to activities knowingly exposed to the public, nor when they observe from a public place).

The property immediately surrounding Taylor's home qualifies as curtilage under the Supreme Court's four factor test, and is therefore entitled to Fourth Amendment protection. Defendants-Appellees claim that Rose did not intrude upon protected curtilage. The four factors used to determine whether an area is a home's curtilage are:

> (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by.

*Widgren*, 429 F.3d at 582 (citations omitted). First, the property at issue immediately surrounds Taylor's home. Indeed, the defendants-appellees do not contest the satisfaction of the first factor. Second, the property is also within an enclosure surrounding the home. While there might not be physical enclosures of this land, Taylor claims, that like the defendant in *United States v. Depew*, 8 F.3d 1424 (9th Cir. 1993), he chose the property because it was remote, in a secluded area, not visible from any highway due to a long driveway, and had thick trees blocking any public view of the residence. Additionally, Taylor's property is entirely fenced-in on two sides with six foot chain link fencing, including the gate entrance with the "No Trespassing" signs. Collectively, this satisfies the notion of an enclosed property. Third, the nature of the use of the land was for Taylor's enjoyment, as well as his entrance and exit from the land. This, too, satisfies the standards for curtilage. Lastly, we have already mentioned some of steps taken by Taylor to protect the area from observation, including his choice of a secluded locale away from the highway, the fencing placed on the property, as well as the no trespassing signs. All four factors are satisfied, thus qualifying that area as curtilage and requiring Fourth Amendment protection. (NB: The district court acknowledged that Rose "likely breached the curtilage of the home." *Taylor*, 402 F. Supp. 2d at 847 n.7).

C. Exceptions To Warrant Requirement

Given that Taylor had an expectation of privacy in his home and the surrounding curtilage, the next issue is whether a basis for the police action existed. First we consider the exigent circumstances exceptions to getting a warrant. The Sixth Circuit has held that:

> In general, exigent circumstances exist when real immediate and serious consequences would certainly occur if a police officer were to postpone action to get a warrant. The exigent circumstances exception relies on the premise that the existence of an emergency situation, demanding urgent police action, may excuse the failure to procure a search warrant. The United States Court of Appeals for the Sixth Circuit has identified the emergency situations giving rise to the exigent circumstances exception to the warrant requirement as (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, or (4) a risk of danger to the police or others.

*See United States v. McClain*, 430 F.3d 299, 304 (6th Cir. 2005) Here, no exigent circumstances justify Rose's warrantless search.

In the first place, one can ask the *ex ante* question as to whether Rose had probable cause to get a warrant to search the house. Rose was within his rights to go to the house to attempt to contact the homeowner regarding his visit, but Rose's stated purpose for going to the house was his suspicion about a burglar/trespasser. He saw tire tracks and footprints leading to the home. By themselves, these facts do not point in any particular direction. The tracks could just as well have belonged to the homeowner as to a trespasser. Similarly, with respect to the open curtains, they might just as well signal that the homeowner is at home, or might simply be an aesthetic choice. Still, Rose maintains that his years of experience taught him that burglars often leave curtains open in order to watch for oncoming homeowners. These circumstances do not rise to the level of exigent circumstances. There was no hot pursuit of a fleeing felon; there was no concern about imminent destruction of evidence; there was no need to prevent a suspect's escape (indeed, there was no suspect!); and there was no risk of danger to police or others. While one could perhaps contend that fear of a burglar/trespasser might give rise to this last exception, the circumstances, and Rose's behavior, both speak to the contrary. As discussed previously, tire tracks are ambiguous; they might merely have indicated that Taylor was on the property. They certainly are not clear harbingers of risk to the police or others. Similarly, Rose's behavior on Taylor's property did not indicate any danger, let alone risk of danger qualifying as exigent circumstances. Rose walked leisurely around the property, at times with both hands in his pockets. He never took out his weapon nor appeared concerned about any potential risk to his safety. Based on the facts then, Rose's search was not justified by the exigent circumstances exception.

Similarly, the "community caretaking" exception does not apply to the facts of this case. The district court categorized the purposes of Rose's search as "community caretaking." The Supreme Court, in *Cady v. Dombrowksi*, 413 U.S. 433, 441 (1973), describes community caretaking as those actions that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." While in *Cady* the Court held that a warrantless search of a vehicle's trunk for a weapon following the arrest of a police officer for drunk driving was incidental to the police function to protect the "safety of the general public," the Court's conclusion that the search was constitutional was premised in part on the Court's "prior recognition of the distinction between motor vehicles and dwelling places." *Id.* at 447.

Case law indicates that the community caretaking function articulated in *Cady* has been principally applied to the warrantless searches of automobiles. *See United States v. Bute*, 43 F.3d 531, 535 (10th Cir. 1994) (holding that the community caretaking exception to the warrant requirement is applicable only in cases involving automobile searches); *see also United States v. Erickson*, 991 F.2d 529, 531 (9th Cir. 1993) (holding that the fact that a police officer is performing a community caretaking function, however, cannot itself justify a warrantless search of a private residence). The Sixth Circuit makes it clear that "the community care-taking function of the police applies only to actions that are totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *United States v. Williams*, 354 F.3d 497, 508 (6th Cir. 2003) (citation omitted). With that in mind, it is clear that Rose's conduct does not fall within the sanctuary of community caretaking. First, Rose's search of Taylor's property was not an automobile search. Second, by Taylor's own admission, he walked around and peered into Taylor's home because he was worried about a potential burglar/trespasser. Therefore, the very nature of this search was centered upon, not divorced from, detection, investigation, or acquisition of evidence relating to the violation of a criminal statute. Therefore, it is inappropriate to apply the community caretaking exception to the facts of this case.

## II. Qualified Immunity

Section 1983 imposes civil liability on any person who, acting under color of state law, deprives another person of the "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Taylor contends that Rose, while acting under color of state law, violated the Fourth Amendment by conducting an unreasonable search of his home. Rose concedes that he

was acting under color of state law in his capacity as a state conservation officer. Nevertheless, Rose, in addition to denying a violation of the Fourth Amendment, also raised the affirmative defense of qualified immunity. The district court below found that Rose was entitled to qualified immunity. I disagree.

"Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citation omitted). Put another way, a state official sued in his individual capacity , such as Rose, performing a discretionary function is "shield[ed] . . . from civil damages liability as long as [his] actions could reasonably have been thought consistent with the rights [he is] alleged to have violated." *Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005) (citations omitted).

The qualified immunity analysis requires a two-part inquiry evaluating two closely linked questions. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). First, in the light most favorable to the plaintiff, "do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. Second, if a constitutional right was violated, "the next, sequential step is to ask whether the right was clearly established." *Id*. Since I have already concluded that a constitutional right was violated, I move on to whether or not the right was clearly established. I believe that it was.

For a right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "The right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Saucier*, 533 U.S. at 202 (citation omitted). In making this determination, the court must "look first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits." *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (citation omitted). Government officials, however, can be on notice that their conduct violates established law "even in novel factual circumstances." *Hope*, 536 U.S. at 741 (citation omitted).

It is axiomatic that the Fourth Amendment protects homeowners from unreasonable government searches. *See supra*. In this case, it would be clear to a reasonable officer that Rose's conduct was unlawful. Indeed, the above analysis leads to such a conclusion. To wit, Rose, without consent, conducted a warrantless search, breaching the curtilage of the home absent any exigent circumstances. Moreover, even under the express laws of Michigan regulating the Department of Natural Resources, Rose was aware that as "an officer appointed by the Department," any authorized entry upon "private property" for the purposes of "patrolling, investigating or examining" violations of gaming laws without a warrant "does not include dwellings or dwelling houses or that which is within the curtilage of any dwelling house." M.C.L.S § 324.1602(1).

Although this standard requires considering the specific facts here, we need not do so to the point of absurdity. Clearly, this was a home in a remote location, and we do not have a direct case holding that a police officer cannot constitutionally search remote homes -- fortunately we do not need one. The Fourth Amendment provides protection to all "home[s]"-- tenement, farmhouse, and mansion alike. Given these circumstances, a reasonable officer should conclude that this investigation did violate Taylor's constitutional rights.

### III. Prospective Injunctive Relief

Taylor also seeks review of the district court's ruling that he lacks standing to seek injunctive relief against Humphries in her official capacity as director of the DNR.

The jurisdiction of the federal court is limited by the threshold constitutional requirement of an actual case or controversy. *See* U.S. Const. art. III, § 2. "Allegations of possible future injury do

not satisfy the requirements of Art. III. A threatened injury must be certainly impending to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (internal quotations and citations omitted). Further, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *L.A. v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). The district court correctly applied *Lyons* to the case at hand. In *Lyons*, the plaintiff sought a permanent injunction against the defendant city of Los Angeles, enjoining it from using chokeholds during an arrest unless the victim was threatening the immediate use of deadly force. *Lyons*, 461 U.S. at 98. The Court held that the plaintiff failed to establish a case or controversy justifying the injunction sought because his standing depended on whether he was likely to suffer future injury from a police officer's chokehold. *Id.* at 105. The Court held that the plaintiff lacked standing because he was unable to show an imminent threat of future police brutality. *Id.* Ultimately, the Court concluded that,

> [a]bsent a sufficient likelihood that he will again be wronged in a similar way, [the plaintiff] is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional.

*Id.* at 111.

Here, the district court correctly applied this reasoning to Taylor. Taylor has alleged that a custom or practice of the DNR is unconstitutional. Like the plaintiff in *Lyons*, Taylor's standing hinges on whether he is likely to suffer future injury from the allegedly unconstitutional policy. And, as in *Lyons*, Taylor has failed to show any likelihood of future injury. At best, Taylor has shown that he was subject to a single instance of unconstitutional activity, and might one day, as a homeowner, be subject to such injury again. But "while past illegal conduct might constitute evidence . . . regarding whether there is a real and immediate threat of repeated injury, 'where the threat of repeated injury is speculative or tenuous, there is no standing to seek injunctive relief.'" *Blakely v. United States*, 276 F.3d 853, 873 (6th Cir. 2002) (quoting *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 833 (6th Cir. 2001)). Taylor's fear of future injury is especially tenuous given the letter he received from then-DNR director Cool, promising no further security checks on Taylor's property. Like the plaintiff in *Lyons*, without any evidence of a threat of repeated injury, Taylor is no more entitled to an injunction than any other homeowner in the State of Michigan who asserts nothing more than that a certain law enforcement practice is unconstitutional. *Lyons*, 461 U.S. at 111. Accordingly, I would affirm the district court's denial of Taylor's request for injunctive relief.

## Conclusion

For the reasons stated above, I believe the decision of the district court should be reversed in part, and affirmed in part.