NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0108n.06

No. 12-2669

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| NATHANIEL BRENT, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| | ) | |
| MIA WENK, SHEVONNE TRICE, | ) | |
| HEATHER DECORMIER-MCFARLAND, | ) | |
| MONICA SAMPSON, CHARLOTTE | ) | OPINION |
| MCGEHEE, and JOYCE LAMAR, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

FILED
Feb 06, 2014
DEBORAH S. HUNT, Clerk

Before: COLE, GILMAN, and DONALD, Circuit Judges

**RONALD LEE GILMAN, Circuit Judge.** Mia Wenk, Shevonne Trice, Heather Decormier-McFarland, Monica Sampson, Charlotte McGehee, and Joyce Lamar appeal the district court's decision denying them absolute and qualified immunity under federal law and governmental immunity under Michigan law. Nathaniel Brent claims that these defendants, all of whom are social workers, violated his constitutional rights when they searched his home without a warrant and temporarily removed his minor children from his custody. For the reasons set forth below, we **AFFIRM IN PART AND REVERSE IN PART** the decision of the district court and **REMAND** the case for further proceedings consistent with this opinion.

# I. BACKGROUND

## A. Factual background

The incident that sparked this lawsuit took place on January 17, 2010 when Brent's then 15-year-old son, RAB, arrived at a Detroit police station barefoot and wearing only a pair of shorts. Detroit Police Officer Donald Coleman reported the incident to the Wayne County Department of Human Services (DHS). At the same time RAB's mother, Sherrie Brent, who is not a party to this action, contacted DHS about filing incorrigibility charges against RAB. These events prompted Wenk, a DHS employee, to visit Brent's home on January 20 and 21, 2010.

Brent claims that Officer Coleman failed to file the required paperwork to initiate the DHS investigation, and that Coleman subsequently withdrew his report. According to Brent, Coleman determined that the incident resulted from "poor decision making on the part of the youth." The defendants neither acknowledge nor dispute this assertion, nor does Brent cite the record to support his claim.

In any event, Brent allowed Wenk to enter his living room during the January 20, 2010 visit and permitted her to speak with RAB. He claims that the questioning became leading and suggestive, with Wenk eventually demanding to speak to RAB alone over Brent's objection. Wenk then proceeded to interview his other four children without his knowledge or consent. Finally, she demanded that RAB show her the basement of the house where he slept, again without Brent's consent. Brent alleges that this visit allayed Wenk's concerns and that she decided with her supervisor, Sampson, to investigate the family for alternative bases for child neglect—not those related to the original referral from Officer Coleman.

Wenk contacted Brent the next day, January 21, 2010, to arrange for another visit. Brent did not agree to the visit, but Wenk arrived at his home anyway, along with Sampson and Decormier-McFarland. While Wenk spoke with Brent and his wife, Sampson and Decormier-McFarland walked around the entirety of the house, taking photographs without Brent's consent. Brent makes additional allegations regarding the period from January 21, 2010 to February 18, 2010, but because the district court did not rely on these facts in deciding to deny qualified immunity, we need not address them here.

On February 18, 2010, Wenk filed a neglect petition with the Family Division of the Third Judicial Circuit Court for Wayne County (the Family Court) seeking removal of Brent's five minor children, three of whom are boys and two of whom are girls. The Family Court ordered them removed that same day. Detroit police officers took the children from Brent's custody and placed them in emergency shelters that very evening. The Family Court appointed guardians ad litem the following day. On March 3, 2010, the children were placed with foster families. But on March 26, 2010, the children were removed from those placements and returned to the emergency shelters. The male children were eventually placed in separate foster-care centers.

A jury trial regarding the underlying allegations took place in the Family Court on May 11 to 13, 2010. On June 2, 2010, the Family Court ordered the children released to their parents with a directive that DHS continue to supervise the children. The Family Court terminated this supervision on September 10, 2010, finding that the Brents had improved the conditions in their home and the children's needs were being met.

**B. Procedural background**

Brent filed this lawsuit in February 2010, claiming a multitude of constitutional and state-law violations on the part of the various actors involved with this case. As relevant here, Brent alleged that Wenk, Trice, Decormier-McFarland, and Sampson violated his constitutional rights under the Fourth and Fourteenth Amendments during the January 20 and 21, 2010 visits to his home when they exceeded the scope of Brent's consent to search, misrepresented the purpose of their visit, and photographed the home's interior. He also contends that Wenk, Trice, Decormier-McFarland, Sampson, McGehee, and Lamar denied him various parental rights to make decisions regarding his children in violation of the Fourteenth Amendment's Due Process Clause. Brent further alleges that many of these actions were extreme and outrageous conduct, constituting intentional infliction of emotional distress (IIED) and gross negligence under Michigan law. Finally, he claims that defendant Trice violated MCL § 722.633(1) by failing to report suspected child neglect of RAB while RAB was in the state's custody.

Following discovery, the defendants moved for summary judgment. The district court rejected their claims of qualified and absolute immunity regarding the federal charges and denied state-law immunity on the IIED, gross negligence, and MCL § 722.633(1) claims. This appeal followed.

## II. LEGAL STANDARD—FEDERAL IMMUNITY

### A. Standard of review

"Whether a defendant is entitled to absolute or qualified immunity from liability under 42 U.S.C. § 1983 is a legal question that this Court reviews *de novo*." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009). The denial of qualified immunity premised on a factual dispute is not immediately appealable. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995). "To the extent that a district court's denial of a claim of qualified immunity turns on an issue of law,

however, the Supreme Court has held that the denial constitutes a final, appealable decision

within the meaning of 28 U.S.C. § 1291." *Sheets v. Mullins*, 287 F.3d 581, 585 (6th Cir. 2002).

## B. Absolute immunity

"[S]ocial workers are absolutely immune only when they are acting in their capacity as

*legal advocates*—initiating court actions or testifying under oath—not when they are performing

administrative, investigative, or other functions." *Holloway v. Brush*, 220 F.3d 767, 775 (6th

Cir. 2000) (en banc) (emphasis in original). "The official seeking absolute immunity bears the

burden of showing that immunity is justified in light of the function she was performing." *Id.* at

774. "When applied, [t]he defense of absolute immunity provides a shield from liability for acts

performed erroneously, even if alleged to have been done maliciously or corruptly." *Kovacic v.*

*Cuyahoga Cnty. Dep't of Children & Family Servs.*, 724 F.3d 687, 694 (6th Cir. 2013)

(alteration in original) (internal quotation marks omitted).

## C. Qualified immunity

As set forth in *Andrews v. Hickman County*, 700 F.3d 845 (6th Cir. 2012), we review

district court decisions on qualified immunity as follows:

> First, we determine whether based upon the applicable law, the facts viewed in
> the light most favorable to the plaintiff show that a constitutional violation has
> occurred. Second, we consider whether the violation involved a clearly
> established constitutional right of which a reasonable person would have known.
> Third, we determine whether the plaintiff has offered sufficient evidence to
> indicate that what the official allegedly did was objectively unreasonable in light
> of the clearly established constitutional rights.

*Id.* at 853 (internal quotation marks omitted). We may review the denial of qualified immunity

only "to the extent that the appeal involves the abstract or pure legal issue of whether the facts

alleged by the plaintiff constitute a violation of clearly established law." *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008) (internal quotation marks omitted).

"The inquiry into whether a right was clearly established must be conducted in light of the specific context of the case. [It must be] sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . [and] in the light of preexisting law the unlawfulness must be apparent." *Andrews*, 700 F.3d at 853 (second alteration in original) (internal quotation marks omitted). "The plaintiff has the burden of establishing that the law was clearly established at the time of the challenged conduct." *Id.*

## III. FOURTH AMENDMENT CLAIMS

### A. Introduction

The district court denied qualified immunity on four of Brent's Fourth Amendment claims. Specifically, the court found that Brent raised triable issues as to whether:

> (1) Mia Wenk went beyond the scope of the limited consent that had been given to her to enter the living room area of [Brent's] home and question RAB to ensure that he had no medical problems arising from his exposure to the cold weather (January 20th visit); (2) Wenk demanded to be permitted to question RAB outside the presence of either parent (January 20th visit); (3) Wenk, Heather Decormier-McFarland, and Monica Sampson gained entry to his home by misrepresenting the purpose and intent of their visit (January 21st visit); (4) while Wenk kept the Brent parents preoccupied, and despite Brent's expressed objections, Sampson and Decormier-McFarland went throughout the home and photographed the interior of his home (January 21st visit).

In essence, Brent argues that Wenk, Decormier-McFarland, and Sampson violated his Fourth Amendment rights by exceeding the limited consent to search that he had given them.

The social workers do not appear to contest that Brent has raised a triable issue as to whether he suffered a violation of his Fourth Amendment rights. They instead contend that this court had not clearly established as of January 2010 that Brent had a right to be free from unreasonable searches and seizures performed by social workers. In support, they cite *Andrews*,

700 F.3d at 859, which held that the Fourth Amendment's prohibition on unreasonable searches does apply to social workers, but that such law was not clearly established as of 2008 when the relevant events in *Andrews* took place.

### B. Legal standard

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Ct.*, 407 U.S. 297, 313 (1972). "[A] warrantless search or seizure inside a home by a law enforcement officer violates the Fourth Amendment unless an exception to the warrant requirement applies." *Andrews*, 700 F.3d at 854.

### C. Analysis

Wenk, Sampson, and Decormier-McFarland raise a close question as to whether the Fourth Amendment applied to their conduct in January 2010. As the social workers argue, *Andrews* and *Jordan v. Murphy*, 145 F. App'x 513 (6th Cir. 2005), on which *Andrews* relied, suggest that until *Andrews*, this court had not yet clearly established that the Fourth Amendment applies to the activities of social workers. On the other hand, since *Andrews*, this court has held that the clearly established law in this circuit determined as early as 2002 that the Fourth Amendment applies to the seizure of children by social workers. *See Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 724 F.3d 687, 699 (6th Cir. 2013) (holding that this circuit had clearly established in 2002 that the warrantless seizure of children by social workers violates the Fourth Amendment). And in doing so, this court reasoned that, presumptively, the Fourth Amendment applies to all searches and seizures performed under color of law. *See id.* We must

now decide whether *Andrews* or *Kovacic* governs the search of a home in 2010. Because Brent's

Fourth Amendment allegations relate to the search of his home, and not to the seizure of his

children, we hold that *Andrews* controls.

*Andrews* concerned the search of the plaintiff's home following a complaint to a state

agency responsible for the welfare of children. The plaintiff in *Andrews* claimed that police

officers arrived at his home with employees of the State Department of Children's Services in

tow. Andrews testified that when he walked into his home, he "was immediately followed into

[his] house by an officer, closely followed by the three [Department of Children's Services]

employees, and then another officer, creating a 'whoosh of presence' and 'flooding' into the

home." *Andrews*, 700 F.3d at 850. He also claimed that he was coerced into consenting to the

interview of his children outside his presence and acquiescing in a walk-through of his home,

both performed by the Children's Services employees. *Id.* at 851.

Andrews sued, alleging, among other things, that the state employees violated his Fourth

Amendment rights by entering his home without a warrant or his consent, interviewing his

children without his consent, and walking through his home without his consent. The social

workers claimed absolute and qualified immunity, but the district court held that they were not

entitled to immunity. On appeal, this court reversed. The court first explained that,

> [i]f their implication is that social workers are not state actors for the purposes of
> the Fourth Amendment, the Supreme Court has established that the Fourth
> Amendment's restrictions on unreasonable searches and seizures extend well
> beyond the police:
>
> > [T]he Court has long spoken of the Fourth Amendment's strictures
> > as restraints imposed upon "governmental action"—that is, "upon
> > the activities of sovereign authority." Accordingly, we have held
> > the Fourth Amendment applicable to the activities of civil as well
> > as criminal authorities. . . . Because the individual's interest in
> > privacy and personal security "suffers whether the government's
> > motivation is to investigate violations of criminal laws or breaches

> of other statutory or regulatory standards," it would be anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.

*New Jersey v. T.L.O.*, 469 U.S. 325, 335 (1985) (internal citations omitted). Thus, the presumption appears to be that any state officer should operate with the default understanding that the Fourth Amendment applies to her actions, unless a specific exception to the requirements of the Fourth Amendment has been found to apply.

*Id.* at 858–59. The *Andrews* court concluded, based on this presumption, that the Fourth Amendment applied to the Children's Services employees. *Id.* at 859.

Nonetheless, the *Andrews* court noted that this circuit had no clearly established law indicating that social workers were subject to the restrictions of the Fourth Amendment in the performance of their duties; that is, it determined that, as of 2008, this court had not yet clearly established that social-worker activities are subject to the Fourth Amendment. The court explained that this court's unpublished decision in *Jordan*, 145 F. App'x 513, "is the only case from our court that bears on the issue of whether the reasonable social worker, facing the situation in the instant case, would have known that her conduct violated clearly established law. Yet, *Jordan* fails to give clear guidance to the social worker faced with the decision to enter the Andrews home." *Andrews*, 700 F.3d at 861. Thus, although the court concluded that "social workers in entering a home are governed by the Fourth Amendment, and . . . that no social worker exception applies in such situations," it said that clearly established law did not compel such a conclusion in 2008 when the search occurred. *Id*. at 863.

In *Kovacic v. Cuyahoga County Department of Children and Family Services*, 724 F.3d 687, 699 (6th Cir. 2013), this court also considered whether a warrantless search and seizure by child welfare officials violated the Fourth Amendment. As in *Andrews*, *Kovacic* relied on the premise that state actors are presumptively subject to the Fourth Amendment. *Id.* at 698 (citing

*Camara v. Municipal Ct.,* 387 U.S. 523, 530–31 (1967)). But contrary to *Andrews*, *Kovacic*

reached the following conclusion:

> In sum, there is an absence of pre–2002 case law specifically mentioning social workers, which under our binding precedent is insufficient to upset the presumption that all government searches and seizures are subject to the strictures of the Fourth Amendment. We thus agree with the district court that at the time of the social workers' actions, it was clearly established that Fourth Amendment warrant requirements, including the exigent-circumstances exception, apply to the removal of children from their homes by social workers.

*Kovacic*, 724 F.3d at 699. The *Kovacic* court drew this conclusion after considering *Andrews*.

Collectively, *Andrews* and *Kovacic* indicate that before this court decided *Andrews* in 2012, a social worker entering a home without a warrant did not violate clearly established law, but a social worker removing a child without a warrant did. Brent does not allege that his children were removed in violation of the Fourth Amendment; he instead challenges the warrantless entry into his home. *Andrews* therefore controls this case, meaning that the social workers are entitled to qualified immunity on Brent's Fourth Amendment claim.

Brent does not challenge this interpretation of *Andrews*, but instead argues that *Andrews* was wrongly decided. He relies on decisions of district courts within this circuit and the decisions of other circuits to establish that there has never been a social-worker exemption to the Fourth Amendment.

Brent's argument is without merit. First, *Andrews* belies Brent's argument by holding that there was no clearly established law regarding a social worker exemption in 2008, when the events in *Andrews* took place. And Brent cites no case that would indicate a change in this circuit's law between 2008 and 2010, when the events of this case took place. Second, and relatedly, "[w]hen determining whether a constitutional right is clearly established, we look first to decisions of the Supreme Court, then to our own decisions and those of other courts within the

- 10 -

circuit, and then to decisions of other Courts of Appeal." *Andrews*, 700 F.3d at 853. Brent's

reliance on district court cases within this circuit and on the law of other circuits is therefore

unavailing. Because our circuit in *Andrews* held that there was no clearly established law

regarding the Fourth Amendment's applicability to social workers in 2008, that determination

controls this case. We therefore reverse the judgment of the district court and grant the social

workers qualified immunity on Brent's Fourth Amendment claims.

## IV. FOURTEENTH AMENDMENT CLAIMS

### A. Background

The district court also denied qualified immunity to the defendants on several of Brent's

Fourteenth Amendment claims. It interpreted Brent's claims as violations of both his

"procedural due process interest in parenting" and his "substantive fundamental right to raise

[his] child[ren]." *Quoting Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000). Analyzing both

bases for Brent's claims, the district court determined that "[t]o the extent that Brent's claim is

based upon the removal of the children from his home, the State Defendants are correct that they

cannot be held liable for any such deprivation because the family court—not the State

Defendants—bore the ultimate responsibility for this decision." Nonetheless, the district court

determined that Brent did raise triable issues regarding whether the social workers made

decisions regarding the removed children's care without consulting him. The court specifically

identified the following five actions:

> (1) various examinations and interventions that were conducted without his
> knowledge or consent and in the absence of any court order; (2) the refusal of
> several Defendants to seek or permit his input in decisions regarding his
> children's medical, educational, residential, and other needs; (3) the failure to
> advise him of decisions that had been made with respect to his children;
> (4) certain Defendants' insistence that—notwithstanding their conclusion that the
> home conditions were adequate and safe—they would recommend the children's
> return only if he would waive his right to a jury trial and give up all post-return

> decision-making authority with respect to their education, medical care, and extracurricular activities; and (5) the creation of a document that purported to appoint the Chinavares as the temporary guardians of the male children without parental consent or a court order.

(internal citation omitted).

On appeal, the defendants contend that both absolute and qualified immunity shield them from these claims. They first argue that they are entitled to absolute immunity for all of their actions leading up to the Family Court's removal order because the Family Court mandated the only constitutionally cognizable deprivation that Brent suffered—the removal of his children from his custody. Second, the defendants contend that Brent retained no protected liberty interest in the parenting of his children after the Family Court placed them in foster care. They accordingly argue that their failure to consult Brent regarding his children did not violate his due process rights under the Fourteenth Amendment.

## B. Legal standard

The Fourteenth Amendment's Due Process Clause guarantees that no "State [shall] deprive any person of life, liberty, or property, without due process of law." Supreme Court precedent holds that "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). A state may extinguish parental rights only by proving that "clear and convincing evidence" so warrants. *Id.* at 769. Yet beyond a liberty interest in the future custody of one's child, the Supreme Court has not delineated the rights of parents temporarily deprived of the custody of their children. And neither party points us to any precedents from this circuit that illuminate the meaning of the right to raise one's child.

We particularly note that

- 12 -

> not every disregard of its regulations by a public agency . . . gives rise to a cause of action for violation of constitutional rights. Rather, it is only when the agency's disregard of its rules results in a procedure which in itself impinges upon due process rights that a federal court should intervene in the decisional processes of state institutions.

*Bates v. Sponberg*, 547 F.2d 325, 329–30 (6th Cir. 1976). Brent must therefore show not only that the state violated its own procedures, but that such violation resulted in a procedure that violated constitutional due process. That is, he must show that the resulting procedure contravenes clearly established federal law.

## C. Analysis

The social workers first argue that the district court misinterpreted this court's decision in *Pittman v. Cuyahoga County Department of Children and Family Services*, 640 F.3d 716, 722 (6th Cir. 2011), and that properly understood, the case indicates that absolute immunity shields them from all of Brent's claims. In *Pittman*, the plaintiff claimed that an agent of the county's child welfare agency

> unconstitutionally deprived him of his fundamental liberty interest in maintaining a parental relationship with [his child] by regularly, repeatedly and on an ongoing basis misrepresenting his status, his whereabouts and his attitude towards parenting [his child] to the Juvenile Court; by misrepresenting his status [and] his attitude toward parenting when participating in agency decisions regarding the placement and custody of [his child]; and by completely cut[ting] him out of the [placement and custody] process.

*Id.* at 723–24 (third, fifth, and sixth alterations in original) (internal quotation marks omitted). Pittman also claimed that the defendants misled him to believe that he would be next in line for custody of his child if they determined the child's mother to be an unfit parent. *Id.* at 724.

The *Pittman* court first held that absolute social-worker immunity protects against liability for the filing of a complaint and affidavit in support of removal of a child. *Id.* Specifically, the court noted that "[w]hether [the social worker] made intentional

misrepresentations to the juvenile court in the complaint and affidavits does not affect the conclusion that she is entitled to absolute immunity." *Id.* at 725. The *Pittman* court drew on *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (en banc), which analogized social-worker immunity in such contexts to prosecutorial immunity.

In the present case, the district court properly applied *Pittman*. It held that "[t]o the extent that Brent's claim is based upon the removal of the children from his home, the State Defendants are correct that they cannot be held liable for any such deprivation because the family court—not the State Defendants—bore the ultimate responsibility for this decision." The district court found triable issues only with regard to whether the social workers failed to properly consult with Brent after the children's removal. Accordingly, *Pittman*, standing alone, does not contradict the district court's analysis.

The social workers nonetheless argue that Brent's remaining claims should be dismissed based on absolute immunity under *Holloway* because they were acting in their capacity as legal advocates. Alternatively, they contend that the rights that the district court identified were not clearly established and, therefore, qualified immunity shields them. On a claim of absolute immunity, "[t]he official seeking absolute immunity bears the burden of showing that immunity is justified in light of the function she was performing." *Holloway*, 220 F.3d at 774. But on a claim of qualified immunity, "[t]he plaintiff has the burden of establishing that the law was clearly established at the time of the challenged conduct." *Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012). We will now consider each of Brent's Fourteenth Amendment claims in turn.

### 1. Social worker action 1: interrogation of Brent's children without his consent

Brent alleges that Wenk, Sampson, and Decormier-McFarland interrogated his children in violation of his constitutional rights. In particular, he asserts that Wenk interviewed all of his children without his consent when she visited his home on January 20, 2010. He also claims that Sampson and Decormier-McFarland seized RAB by forcing him to show them around Brent's residence on January 21, 2010.

Brent cites two cases to suggest that the actions of Wenk, Sampson, and Decormier-McFarland were a violation of his clearly established Fourteenth Amendment rights, but neither is persuasive. First, he cites *Myers v. Potter*, 422 F.3d 347 (6th Cir. 2005), which held that police officers violated Myers's Fourth Amendment rights when they interrogated Myers, who was then a child, for three hours beyond the one hour to which his mother had consented. Brent's claim differs in two critical respects. First, Brent asserts his claim under the Fourteenth Amendment, but *Myers* clearly established the law only under the Fourth Amendment.

The second critical difference between this case and *Myers* is that Brent asserts the claim on his own behalf, not on behalf of his children. *Myers* reaffirmed the unremarkable proposition that a party interrogated without valid consent suffers a constitutional violation. It provides no authority to suggest that a father personally suffers a constitutional violation when social workers interrogate his children without his consent. Accordingly, *Myers* provides no authority regarding Brent's Fourteenth Amendment rights.

The other case that Brent cites, the Seventh Circuit decision in *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003), is also distinguishable. *Doe* held that

> because the defendants had no evidence giving rise to a reasonable suspicion that the plaintiff parents were abusing their children, or that they were complicit in any such abuse, the defendants violated the plaintiffs' right to familial relations by conducting a custodial interview of John Doe Jr. without notifying or obtaining the consent of his parents and by targeting the plaintiff parents as child abusers.

*Id.* at 524.

But *Doe* alone does not clearly establish the law in the Sixth Circuit. As this court clearly explained in *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042–43 (6th Cir. 1992):

> [I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law. For the decisions of other courts to provide such "clearly established law," these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.

This reasoning severely limits *Doe*'s import as an out-of-circuit case. Moreover, the holding in *Doe* does not point "unmistakably to the unconstitutionality of the conduct complained of here," *see id.* at 1043, because RAB's under-dressed mid-January arrival at a police station in fact gave rise to a reasonable suspicion of child abuse. Finally, *Doe* actually granted qualified immunity to the caseworkers on the basis that they would have believed that state law gave them authority to conduct such an interview. Brent has therefore cited no authority supporting the conclusion that the interrogation of his children violated a constitutional right.

We also note that *Kovacic v. Cuyahoga County Department of Children and Family Services*, 724 F.3d 687 (2013), is not to the contrary. *Kovacic* determined that this circuit had "clearly established [as of 2002] that Fourth Amendment warrant requirements, including the exigent-circumstances exception, apply to the removal of children from their homes by social workers." *Id.* at 699. The case held that a parent may sue social workers for such constitutional violations. But *Kovacic* did not address whether a temporary seizure within the home (i.e., to interrogate the children) violated the Fourth Amendment. Neither do the parties' submissions to

this court. Absent any further discussion on this point, Brent has failed to carry his burden of showing that the actions of Wenk, Sampson, and Decormier-McFarland violated clearly established law. Qualified immunity is therefore appropriate on these claims.

### 2. *Social worker actions 2 and 3: failure to seek Brent's input in decisions regarding the children and failure to advise Brent of the decisions*

Brent fails to carry his burden of showing that any of these alleged actions violated clearly established law. His principal contention is that *Santosky* guaranteed him the right to be consulted regarding his children's care while they were not in his custody. But *Santosky*'s holding is considerably more limited. *Santosky* considered the interest parents retain in the permanent custody of their children when the state temporarily removes the children from their parents' care. *See Santosky v. Kramer*, 455 U.S. 745, 753 (1982). It did not consider the parents' right to participate in other decisions concerning the children's welfare while they are temporarily in the state's custody. Accordingly, Brent has not identified any clearly established law that the defendants allegedly violated.

Brent next argues that MCL §§ 712A.13a(10)(c) and 722.124a gave him certain rights, and that the state's failure to honor its state-law obligations itself violates due process. Michigan Compiled Law § 712A.13a(10) provides that "[i]f the court orders placement of the juvenile outside the juvenile's home, the court shall inform the parties . . . [t]hat participation in an initial services plan is voluntary without a court order." And MCL § 722.124a gives social workers the right to consent to routine medical treatment for children in their care. Brent cites three cases in support of his claim that the defendants' purported violations of MCL §§ 712A.13a(10) and 722.124a constitute a federal due process violation: *Wolff v. McDonnell*, 418 U.S. 539 (1974); *Goss v. Lopez*, 419 U.S. 565 (1975); and *Perry v. Sniderman*, 408 U.S. 593 (1972).

We find none of these cases on point. In *Wolff*, the Supreme Court confronted "important questions concerning the administration of a state prison," namely whether "disciplinary proceedings did not comply with the Due Process Clause." 418 U.S. at 542–43. The case before us, in contrast, concerns child-neglect proceedings, and Brent does not challenge the adequacy of the proceedings, but only the social workers' alleged failure to comply with state law.

*Goss* is similarly not on point. That case concerned a class of high-school students' suspensions from school. The Supreme Court held that the Due process Clause "requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. at 581. Brent is not asserting that his children were suspended from school, so *Goss* is of no relevance to the present circumstances.

Finally, Brent cites *Perry*. The Supreme Court in *Perry* held that the government cannot deny a governmental benefit to a recipient because of the recipient's exercise of a constitutional right. *See* 408 U.S. at 597–98. Although *Perry* might bear on Brent's retaliation claim, discussed in the next subsection, it has no relevance to the provisions at issue in this subsection.

All three cases cited by Brent are therefore distinguishable. On the other hand, this court's recent decision in *Jasinski v. Tyler*, 729 F.3d 531 (6th Cir. 2013), although cited by neither side, is directly on point. The key holding in *Jasinski*, a case involving a different provision of Michigan's child-protection laws, is as follows:

> To establish a procedural due process claim, a plaintiff must show "(1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the . . . interest." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). A liberty interest may be created by state law when a state places "substantive limitations on official discretion." *Tony*

> *L. and Joey L. v. Childers*, 71 F.3d 1182, 1185 (6th Cir. 1995) (quoting *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983)). A state may create such limitations by "establishing 'substantive predicates' to govern official decision-making . . . and further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Id.* (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989)). The state statute "must use 'explicitly mandatory language' requiring a particular outcome if the articulated substantive predicates are present." *Id.* (citing *Thompson*, 490 U.S. at 463).

*Id.* at 541. Michigan Compiled Laws § 712a.13a(10)(c) appears to qualify as such a substantive limitation on official discretion because the statute specifies that "[i]f the court orders placement of the juvenile outside the juvenile's home, the court *shall* inform the parties . . . [t]hat participation in an initial services plan is voluntary without a court order." (emphasis added).

But Brent does not rely on *Jasinski*, and we are therefore loathe to address the constitutional dimensions of MCL § 712a.13a(10)(c) here. This is particularly so because we have discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In the present case, we have concluded that Brent has not carried his burden of showing that the law applicable to his case was clearly established. *Jasinski* supports this reasoning because *Jasinksi* itself held that "we cannot say that a reasonable [Child Protective Services] official would understand that the failure to file a petition under § 722.638 would constitute a denial of procedural due process. No decision has yet found a procedural due process right in a similar context." *Jasinksi*, 729 F.3d at 544. Likewise, the parties here have pointed us to no case suggesting a constitutional dimension to MCL § 712a.13a(10)(c). The social workers are therefore entitled to qualified immunity on these procedural due process claims.

> ### 3. Social worker action 4: alleged insistence that Brent waive his right to a jury trial in order to obtain the social workers' approval of the children's return to his custody

The district court also denied qualified immunity on Brent's claim that certain defendants insisted that—notwithstanding their conclusion that the home conditions were adequate and safe—they would recommend the children's return only if he would waive his right to a jury trial and give up all post-return decision-making authority with respect to their education, medical care, and extracurricular activities. On appeal, the social workers argue that this conduct was intimately connected to their role as advocates and, in any event, only the Family Court could have ordered the children's return. We agree.

Under this court's decision in *Pittman v. Cuyahoga County Department of Children and Family Services*, 640 F.3d 716, 725 (6th Cir. 2011), the removal of the children from parental custody was one entrusted to the Family Court. Accordingly, the Family Court affected the deprivation, not the social workers, whatever their conduct in so advocating. The decision to return the children, and the advocacy associated therewith, is entitled to the same immunity. Indeed this court has so held. Considering Tennessee's child welfare statute, this court explained that

> Tennessee law entrusts the decision whether to return a neglected child to the home from which he was removed to the Juvenile Court. The Department [of Children's Services] acts in an advisory role to the Juvenile Court in recommending that the child is ready to return home. In performing that role, social workers in the Department act in much the same fashion as probation officers who make sentencing recommendations to criminal courts for which they are entitled to absolute immunity. . . . Social workers involved in the investigation or recommendation are, therefore, entitled to absolute immunity with respect to claims arising from such recommendations and investigations.

*Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 422–23 (6th Cir. 2001) (internal citations omitted). The same logic applies here. Advocacy and decisions concerning the return of removed children are entitled to the same immunity as advocacy and decisions concerning their initial removal.

Moreover, *Perry v. Sniderman*, 408 U.S. 593 (1972), offers no help to Brent. A claim for retaliation under *Perry* must allege that the government denied the plaintiff a benefit because the plaintiff exercised a constitutional right. *See* 408 U.S. 597 ("[The government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests . . . ."). Here, Brent appears to claim that he had the right to have the social workers recommend the return of his children (the purported benefit), and that they denied him this benefit because he chose to exercise his right to a jury trial in the Family Court (the purported constitutional right).

Brent is wrong twice over. First, a recommendation from the social workers is not a benefit within the meaning of *Perry* but is, as we have just explained, an action committed to the absolute discretion of the social workers. Second, although Brent may have been entitled to a jury trial in the Family Court under Michigan law, Brent provides no authority holding that the Fourteenth Amendment requires such a procedure, so he cannot claim that he exercised a constitutional right at all. We therefore find *Perry* inapposite to the present case.

In sum, the defendants are entitled to absolute immunity on this claim. We therefore reverse the district court's judgment to the contrary.

### 4. *Social worker action 5: creation of a document that purported to appoint the Chinavares family as the temporary guardians of the male children*

Finally, the district court determined that Brent raised triable issues regarding the creation of a document that purported to appoint the Chinavares family as the temporary guardians of the male children without parental consent or a court order. The document, issued on the Department of Human Services' stationery states that "Noel and Michael Chinavare does [sic] have temporary guardianship of [AB, RB, and JB]."

As earlier discussed, the only case that Brent cites in support of his parental rights, *Santosky v. Kramer*, 455 U.S. 745 (1982), held that a state may "may sever *completely and*

*irrevocably* the rights of parents" only by proving that "clear and convincing evidence" so warrants. *Id.* at 747–48 (emphasis added). Brent cites no authority supporting the proposition that the document declaring that the Chinavares had *temporary guardianship* of Brent's three boys violated his right to due process. Indeed this claim also fails under qualified immunity's first prong—that the defendants violated Brent's constitutional rights at all—because Brent has not alleged, much less proffered evidence, that the document actually deprived him of the custody of his children. Absent some authority suggesting that clearly established law prohibited the social workers' actions, Brent has failed to carry his burden of establishing that a reasonable juror could find to the contrary. Qualified immunity is therefore appropriate on this claim.

### 5. *Alleged discovery violation*

The social workers also appeal the district court's decision regarding "[i]mmunity as to the alleged failure to produce documents." In its opinion, the district court considered this claim "as falling within [Brent's] parental rights claim." Brent argues that MCL § 722.627(2)(f) gives him the right to access DHS records regarding his children.

The language of the statute reads as follows:

Unless made public as specified information released under section 7d, a written report, document, or photograph filed with the department as provided in this act is a confidential record available only to 1 or more of the following . . .

(f) A person named in the report or record as a perpetrator or alleged perpetrator of the child abuse or neglect or a victim who is an adult at the time of the request, if the identity of the reporting person is protected as provided in section 5.

As we explained with regard to MCL § 712a.13a(10)(c), MCL § 722.627(2)(f) appears to "place[] substantive limitations on official discretion" that would render any violation of MCL § 722.627(2)(f) an additional violation of Brent's procedural due process rights. *See Jasinski v. Tyler*, 729 F.3d 531, 541 (6th Cir. 2013) (internal quotation marks omitted). Brent, however,

does not so argue. Nor does he cite any authority suggesting that "a reasonable [Child Protective Services] official would understand that the failure to [comply with MCL § 722.627(2)(f)] would constitute a denial of procedural due process. No decision has yet found a procedural due process right in a similar context." *See Jasinksi*, 729 F.3d at 544. The burden on this issue is Brent's—a burden to show the violation of clearly established federal law. *See Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012) ("The plaintiff has the burden of establishing that the law was clearly established at the time of the challenged conduct."). This is a burden that Brent has failed to meet.

We also note some difficulty in discerning the factual basis for Brent's claim. Brent appears to have requested the entire case file on his children. But Brent does not clarify in his briefing which of these documents he was allegedly denied. As the defendants point out, Brent's complaint acknowledges that the defendants did deliver some documents to Brent's attorney "during the hearing on March 30, 2010." The record does not reveal whether these March 30, 2010 documents are the entire basis for this claim or only some portion of it. And Brent has not established that this timing violated his due process rights. He has, therefore, failed to carry his burden against the defendants' assertions of qualified immunity with regard to the documents in question. For these reasons, we grant qualified immunity to the defendants on this claim.

## V. STATE-LAW CLAIMS

### A. Background

The district court also denied governmental immunity on several of Brent's state-law claims. Specifically, the district court denied state-law immunity on Brent's IIED and gross-negligence claims against Wenk, Sampson, Trice, McGehee, and Lamar, as well as his claim under MCL § 722.633(1) against Trice. We will consider each claim in turn.

## B. Legal standard

The Michigan Supreme Court has

[p]rovide[d] these steps to follow when a defendant raises the affirmative defense of individual governmental immunity. The court must do the following:

(1) Determine whether the individual is a judge, a legislator, or the highest-ranking appointed executive official at any level of government who is entitled to absolute immunity under MCL 691.1407(5).

(2) If the individual is a lower-ranking governmental employee or official, determine whether the plaintiff pleaded an intentional or a negligent tort.

(3) If the plaintiff pleaded a negligent tort, proceed under MCL 691.1407(2) and determine if the individual caused an injury or damage while acting in the course of employment or service or on behalf of his governmental employer and whether:

(a) the individual was acting or reasonably believed that he was acting within the scope of his authority,

(b) the governmental agency was engaged in the exercise or discharge of a governmental function, and

(c) the individual's conduct amounted to gross negligence that was the proximate cause of the injury or damage.

(4) If the plaintiff pleaded an intentional tort, determine whether the defendant established that he is entitled to individual governmental immunity under the *Ross* test by showing the following:

(a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,

(b) the acts were undertaken in good faith, or were not undertaken with malice, and

> > > (c) the acts were discretionary, as opposed to ministerial.

*Odom v. Wayne Cnty.*, 760 N.W.2d 217, 228 (Mich. 2008). Contrary to who bears the burden of proof in the federal context, "the burden . . . fall[s] on the governmental employee to raise and prove his entitlement to immunity as an affirmative defense." *Id.* at 227–28.

## C. Analysis

### 1. IIED claims

Brent alleges that the social workers intentionally inflicted emotional distress upon him in myriad ways. The district court dismissed several of Brent's IIED claims, but identified many more as remaining for trial. As the district court explained,

> [t]he essence of these allegations is that the State Defendants, despite having no actual belief that the Brent children were exposed to any harm in the home, nevertheless undertook a campaign to discover—or even fabricate—damaging evidence so as to get the children removed, and then, having accomplished that purpose, used the return of the children as collateral to coerce Brent to relinquish his parental authority. For example, Brent alleges that (1) Wenk, with Sampson's approval, continued her investigation of the Brent family, notwithstanding their conclusion that the initial complaint was unsubstantiated, (2) Wenk and Sampson conducted this investigation having already predetermined the outcome and falsified various reports to support this outcome; (3) Wenk, Trice, McGehee, Lamar, and Sampson refused to explain what services were being offered to the Brent family or what harm, if any, the children faced in the absence of those services; (4) Wenk, Trice, McGehee and Sampson withheld information from Brent and refused to permit him to have any input regarding what was best for the family; (5) Wenk abused her authority to force her will upon the parents upon threat of the children not returning or being removed again after their return; (6) Wenk, Sampson, and Lamar refused to advise Brent what he needed to do to facilitate the return of his children; (7) Wenk coerced Brent into turning over all post-return decision-making authority with respect to the children's education, medical care, and extracurricular activities by threatening that the children would otherwise not be permitted to return; (8) Sampson and Lamar refused to respond to or investigate Brent's claims regarding constitutional, statutory, and policy violations; (9) despite having determined that the home was suitable for the children's return, Trice, Lamar, and McGehee held the children hostage to coerce the Brents to forfeit their right to trial and falsified various documents to justify not returning the children; (10) Trice refused to provide services to reunify the

family, notwithstanding the review board's conclusions that the medical and educational needs of the children were not being met during their removal and that they should be returned to the Brent home. Brent also alleges that these actions were taken with reckless disregard for their effect on him, and caused him extreme emotional distress.

The social workers argue on appeal that they had no reason to know that any of these purported actions were unlawful, and that because the Family Court jury determined that Brent had neglected his children, their investigation cannot have been conducted with malice. They further contend that if this court finds no federal constitutional violations, then they must have been acting within the scope of their authority. Brent responds that because Michigan law requires the state employees to be trained in their legal duties, they cannot plausibly claim that they were mistaken as to those duties. He also contends that the defendants have offered no evidence suggesting that they were acting in good faith.

We find Brent's arguments the more persuasive at this stage of the case. First, the defendants cite no cases, orders of the Family Court, or Michigan statutes authorizing the ten actions that the district court identified as remaining for trial. Second, the defendants cite no authority for the proposition that simply because their actions did not violate the U.S. Constitution, they could reasonably believe that they were within the scope of their state-law authority. The defendants also fail to cite any compelling authority to support their claim that because the Family Court jury determined that Brent had neglected his children, none of their actions could have been taken with malice. Although they rely on the opinion of the Michigan Court of Appeals in *Latits v. Phillips*, 826 N.W.2d 190 (Mich. Ct. App. 2012), for the proposition that a finding of probable cause defeats a claim for false arrest, they offer no authority to suggest that Michigan law applies this holding to the actions of social workers in the context of child-neglect proceedings. Accordingly, we affirm the district court's decision that, at

this stage, the defendants have failed to negate the absence of a genuine dispute regarding Brent's IIED claims, but we note that they may reassert their state-law immunity defense upon the completion of discovery.

### 2. *Gross-negligence claims*

For similar reasons, we deny the defendants' claims of governmental immunity on Brent's gross-negligence claims. The parties' briefing and the district court's opinion leaves some doubt as to what the factual bases are for these claims. Nonetheless, as with Brent's IIED claims, the burden is on the government official asserting immunity to prove that she or he is so entitled, *see Odom v. Wayne Cnty.*, 760 N.W.2d 217, 227–28 (Mich. 2008), which includes proving that he or she "was acting or reasonably believed that he was acting within the scope of his authority." *Id.* at 228. As with Brent's IIED claims, the defendants have failed to cite the authority that allegedly authorized their actions. Absent such authority, we cannot conclude as a matter of law that the defendants reasonably believed that Michigan law authorized their actions. State-law immunity is therefore inappropriate at this stage of the case.

### 3. *Michigan Compiled Laws § 722.633(1) claim*

Finally, we consider Brent's claim that "Trice is liable to Plaintiff under MCL 722.633(1) for the damages caused from her failure to report the medical neglect of Plaintiff's son, including but not limited to medical expenses and emotional distress suffered by Plaintiff as a result of her failure." Michigan Compiled Laws § 722.633(1) provides that "[a] person who is required by this act to report an instance of suspected child abuse or neglect and who fails to do so is civilly liable for the damages proximately caused by the failure." The district court considered this claim and explained that "[a]lthough the State Defendants request a dismissal and/or a summary judgment with respect to Brent's entire amended complaint, Trice has not made any argument

specifically regarding this claim. Therefore, and in the absence of any argument or briefing by the parties, this claim will proceed."

On appeal, Trice does not dispute that she failed to specifically address this claim before the district court, but instead argues that Brent lacks standing to bring this claim himself and that it should instead have been brought by RAB. She adds that even if RAB had brought this claim, the neglectful party rather than Trice herself would be the proximate cause of any injuries. Brent counters that both whether he was injured by the failure to report (and therefore has standing to bring this claim) as well as the proximate cause of any injury are factual issues that are not before us on appeal.

On this claim the law favors Trice. "Even if no party to this appeal has raised the issue of standing, this court can and must address the issue on its own motion." *Jaimes v. Toledo Metro. Hous. Auth.*, 758 F.2d 1086, 1092 (6th Cir. 1985). Here, the Michigan Supreme Court has explained that "the Legislature intended that liability under [MCL § 722.633(1)] be limited to claims for damages *by the identified abused child* about whom no report was made." *Murdock v. Higgins*, 559 N.W.2d 639, 646 (Mich. 1997) (emphasis added) (quoting *Marcelletti v. Bathani*, 500 N.W.2d 124, 127 (Mich. Ct. App. 1993)). Brent brings this claim in his own name, not RAB's. Accordingly, his claim must be dismissed for lack of standing.

## VI. CONCLUSION

For all of the reasons set forth above, the judgment of the district court is **AFFIRMED** with regard to Brett's state-law claims of IIED and gross negligence. Its judgment with regard to the remainder of Brett's claims is **REVERSED** because the social workers are entitled to either absolute or qualified immunity. We **REMAND** the case to the district court for further proceedings consistent with this opinion.